**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Michael Trebilcock,** | ) | **CASE NO. 1:05 CV 2428** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Gregory Elinksy, et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

### INTRODUCTION

This matter is before the Court upon Plaintiff's Motion for Partial Summary Judgment. This case involves control over a limited liability company. For the reasons that follow, the motion is GRANTED in PART and DENIED in PART.

### FACTS

Only those facts necessary for a resolution of the pending motion are set forth herein.[1]

---

[1]  The Court acknowledges that only those facts supported by admissible evidence are appropriate for consideration at the summary judgment stage. In this case, however, some of the background facts necessary for an understanding of the events

Plaintiff, Michael Trebilcock, filed this lawsuit against defendants, Michael and Gregory Elinsky, seeking, among other things, a declaratory judgment regarding the ownership of Sagebrush, Ltd. ("Sagebrush").

In early 2002, Trebilcock and Michael, Gregory and David Elinsky began discussions concerning the acquisition of certain assets of MCSi, Inc. ("MCSi"). At the time, MCSi employed Trebilcock. David Elinsky decided not to participate in the endeavor and, as a result, Gregory and Michael Elinsky agreed that Trebilcock should pursue discussions with MCSi.

The following month, Sagebrush was formed as a holding company designed to acquire the assets of MCSi. Trebilcock and the Elinskys contributed capital to Sagebrush. The parties dispute the percentage ownership each initially contributed.

At approximately the same time Sagebrush was formed, MCPc, Inc. ("MCPc") was incorporated. On June 28, 2002, MCPc acquired the assets of MCSi and began operating as a technology provider. At the same time, Sagebrush acquired the majority shares of MCPc. No operating agreement existed for Sagebrush prior to the acquisition. A Confidential Offering Memorandum, which was circulated to potential MCPc investors, indicated that Trebilcock was the sole member of Sagebrush. Prior to the closing, Michael Elinsky informed Trebilcock's counsel that he wanted that information changed. In addition, potential investors received a copy of the MCPc business plan, which does not mention either of the Elinskys. The plan does, however, identify Trebilcock as the President and CEO of MCPc. Gregory Elinsky received the plan and forwarded it on to others.

---

leading to this dispute have been taken by the Court from the pleadings. It does not appear that any of these background facts are in dispute.

Although unclear, it appears that immediately following the acquisition of certain assets in MCSi, Michael Elinsky was employed by MCPc. It does not appear that Gregory Elinsky (sometimes "Elinksy") held any position or was involved with the management of either MCPc or Sagebrush. Trebilcock and Michael Elinsky disagreed regarding the authority of Trebilcock to make certain decisions. Michael Elinsky was also concerned about the lack of an operating agreement. He contacted an attorney to discuss the situation. At the same time, Trebilcock and both Elinskys disagreed regarding their ownership interests and management rights in Sagebrush. On September 26, 2002, Michael Elinsky drafted a Draft Memorandum of Understanding ("Memorandum") in an attempt to resolve these issues. The Memorandum indicated that the economic benefits of Sagebrush would be shared in proportion to each individual's capital investment. It further indicated that the parties would be equal voting members and managers of Sagebrush. The Memorandum brought about a six month period of negotiations between the parties regarding these issues. Michael Elinsky testified that Gregory Elinsky was working in the last six months of 2002 to "help resolve" the issues. There is no indication that Gregory Elinsky had any other involvement as an employee or officer of MCPc. In January of 2003, Trebilcock fired Michael Elinksy.

On March 20, 2003, the parties entered into an agreement entitled the Sagebrush Investor Term Sheet ("Term Sheet"). Pursuant to the agreement, plaintiff "bought out" Michael Elinsky's entire ownership interest and a portion of the interest held by Gregory Elinsky. With regard to Gregory Elinsky's interest, the Term Sheet provides as follows,

> **I. [Gregory Elinsky's] Mebership [sic] Interest**
>
> [Gregory Elinsky's] current cash investment in Sagebrush is $900K. As of the Effective Date [Gregory Elinksy's] membership interest in Sagebrush Investment Group LLC shall

>       be equal to 26.203%.
>
>> a. In consideration [of Gregory Elinsky's] entire membership interest [Michael Trebilcock] agrees to pay the following:
>>
>> $600K paid to [Gregory Elinsky] within 45 days of the effective date.
>>
>> $300K paid in 36 equal monthly installments starting on May 1, 2003 at 8% interest.  Should [Michael Trebilcock] repay 65% of the full loan within 12 months this loan shall be interest free to [Michael Trebilcock.]
>>
>> b. In exchange for monies due [Gregory Elinsky] from [Michael Trebilcock] from real estate and securities transactions in the approximate amount of $441,894 [Michael Trebilcock] agrees to transfer 26.203% membership interest in Sagebrush to [Gregory Elinsky.]

In addition, the Term Sheet required Trebilcock to pay Gregory Elinsky $121,000 within 45 days of the "effective date which unwinds the MCSi real estate transaction."  It further provided that Gregory Elinsky would obtain a seat on the Board of Directors of MCPc.  The Term Sheet, however, contained no provisions regarding the rights of Gregory Elinsky and Trebilcock to manage the affairs of Sagebrush.

The term sheet contained similar provisions with regard to the buyout of Michael Elinsky's interest, except that Trebilcock agreed to purchase Michael Elinsky's entire interest in Sagebrush.  Trebilcock paid Michael Elinsky.  Michael Elinsky admits that he no longer holds any interest in either Sagebrush or MCPc.

It is undisputed that Trebilcock failed to make any payment to Gregory Elinksy within 45 days of the effective date of the Term Sheet.  On May 19, 2003, Trebilcock sent Gregory Elinsky a check in the amount of $350,000.   This payment was 15 days late and represented less than half of the amount due pursuant to the Term Sheet.  No further payments were made by Trebilcock at this time.

According to Elinsky, in approximately July of 2003, he informed Trebilcock that his performance under the Term Sheet was "unacceptable" and that he would not agree to sell his interest in Sagebrush.

On and before September of 2003, Elinsky was employed by Merrill Lynch.  He sent an internal memo discussing his involvement with MCPc.  Specifically, the email indicates as follows,

> I am a co vice chairman of mcpc with my brother and brother in law.  My [responsibilities] include 2 annual board meetings.  My [responsibilities] are to serve as an advisor to the company when needed, which generally is twice a year8 [sic] have no other [responsibilities] to the company.

In December of 2003, Elinsky took notes on a copy of the check Trebilcock sent.  The notes indicate that Trebilcock "fulfilled k w/ ME."  In addition, the notes indicate a total of $525,000 under the "still owed" category.  Presumably, these notes refer to the fact that Trebilcock "still owed" Elinsky $525,000.

On June 1, 2004, Elinsky was fired by Merrill Lynch.  According to Trebilcock, Elinsky's interest in the day-to-day operations of MCPc increased dramatically.  Soon thereafter, Elinsky and Trebilcock discussed amending the Term Sheet.  On August 20, 2004, Elinsky sent Trebilcock an email containing the following relevant language,

> Mike–When speaking with you and Dave I did not have the numbers in front of me.  The following outlines the way it should reflect. ...$100K was paid before the March 20 agreement, $350,000 was paid on May 19th, 2003 after the March 20 agreement.  The March 20 agreement has it right and I have attached it for your review, I have a signed copy of this agreement in the file as well if you need it.  Take a look at the changes in the document call if you have any questions.

It appears that the email contained a draft of a proposed amendment to the Term Sheet. According to Trebilcock, Elinsky wanted to "restate and amend" the Term Sheet in order to

5

identify collateral. Trebilcock made certain changes to the proposed amendment and eventually sent Elinsky a document entitled "Agreement," which essentially contains revised buyout provisions, including identification of certain collateral for the buyout. Trebilcock prepared and signed the document, but Elinsky refused. At no point thereafter did Elinsky sign any document regarding a revised buyout.

In November of 2004, an advisory board was created at MCPc. Elinsky chaired the board and, although unclear, it appears that he used it as a means to increase business. On November 1, 2004, Elinsky sent the following email to Trebilcock,

> Mike I am setting up meetings with other advisor board type people with the idea in mind that I shared with you where we pay them based on success of AV Board as a hole [sic] and try to incentivize [sic] them to play together.... Second point would like to hear your feedback on my proposal that if I can grow the business from x to x to x over 5-7 years then I claw back at equity ownership. That would put your split to my split at a maximum of 55/45....

That same month, MCPc negotiated its Fifth Amendment to Loan Documents with its secured lender. The loan documents were amended to permit a "one time advance in the amount of $1,000,000 to Trebilcock to principally fund the acquisition of a portion of the ownership interest in Sagebrush Investment Group, Ltd. held by Gregory N. Elinsky, such that Trebilcock owns a controlling interest therein...." Gregory Elinsky, in his capacity as a director of MCPc, expressly consented to this amendment.

According to Trebilcock, he sent a check in the amount of $690,325.40 to Elinsky on November 24, 2004. The check was sent to Elinsky's house along with an "unrelated" holiday gift. Elinsky claims he never received the check. On February 14, 2005, Trebilcock's attorney sent an email to Elinsky requesting wiring instructions "in lieu" of the check purportedly tendered in November. The email indicated that Trebilcock wanted the wiring instructions to

6

complete payment pursuant to the *Agreement*–not the Term Sheet.  Elinsky refused to provide wiring instructions.

The parties' relationship continued to deteriorate throughout 2005.  On August 9, 2005, Elinsky sent a letter to MCPc's shareholders, board members and employees.  According to Trebilcock, the letter accuses him of committing fraud.

Thereafter, Trebilcock filed this lawsuit.  The amended complaint contains two claims for relief.  Count one seeks a declaratory judgment regarding the ownership and management rights in Sagebrush.  Count two is a claim for defamation.  In addition, Elinsky filed a counterclaim asserting four claims for relief.  Count one seeks a declaratory judgment regarding the ownership and management rights in Sagebrush.  Count two is a claim for fraud and misrepresentation.  Count three asserts a claim for breach of fiduciary duty.[2]  Count four seeks injunctive relief.

Trebilcock moves for partial summary judgment on count one of his complaint.  Specifically, Trebilcock moves that the Court find that he owns 73.797% of Sagebrush, while Gregory Elinsky owns the remaining 26.203%.  In addition, Trebilcock seeks an order that the Term Sheet is a valid and enforceable contract and that he satisfied all payments under that agreement.  Trebilcock also moves for summary judgment on count two of his complaint.  In addition, Trebilcock seeks summary judgment on count two of Elinsky's counterclaim.  Trebilcock further asks that the Court bar Elinsky from relying on conduct predating the Term Sheet to pursue any claims or defenses in this case.  Defendants oppose the motion.

**STANDARD OF REVIEW**

---

[2]  The document filed by Elinsky is a counterclaim and third-party complaint.  Although there are four claims contained in the document, only the first three are asserted against Trebilcock.

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case. *Tolton v. American*

*Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

### DISCUSSION

1. Declaratory judgment claim

     A. Term Sheet and ownership interests in Sagebrush

Trebilcock moves for summary judgment on the grounds that the Term Sheet is an enforceable contract. As such, Trebilcock seeks a declaration that the ownership percentages set forth in that document control. Pursuant to the Term Sheet, Trebilcock owns 73.797% of Sagebrush and Gregory Elinsky owns the remaining 26.203%.

In response, Elinsky argues that he rescinded "that portion" of the Term Sheet involving Trebilcock's buyout of a certain percentage of his interest. In addition, Elinsky argues that Trebilcock failed to substantially comply with the Term Sheet. Trebilcock argues that it is not possible to rescind only a portion of a contract. In addition, he claims that rescission is not permissible because Trebilcock's failure to timely pay is not considered a material breach of the Term Sheet.

Rescission is tantamount to the "unmaking" of a contract. *Owens v. Heilmann*, 1996 WL 56086 at * 2 (Oh. Ct. App. Feb. 12, 1996)(quoting Blacks Law Dictionary (5 Ed.Rev. 1979)). "Generally, without fraud, duress, undue influence, or mistake, one party to a contract cannot rescind or cancel it without the consent of the other party." *Id*. In certain circumstances, a material breach of an agreement by one party is sufficient to permit the other party to the contract to elect to rescind the agreement.

Upon review, the Court finds that Trebilcock is entitled to a declaration that he owns 73.797% of Sagebrush and Gregory Elinsky owns the remaining 26.203%. As an initial matter,

9

the Court agrees with Trebilcock that Elinsky is not legally permitted to rescind a "portion" of the Term Sheet.  Elinsky offers no case law supporting such a proposition.  Partial rescission is not available for indivisible contracts.  *See*, Amjur Contracts § 533 (Partial Rescission)*; See also, Ryley v. Langenbach*, 3 Ohio Law Abs. 475 (Ohio Ct. App. 1925)(partial rescission only available for divisible or separable contracts).  Elinsky does not claim that the Term Sheet is divisible.  Therefore, Elinsky's claim for partial rescission fails.  Moreover, it is undisputed that Elinsky accepted the benefits of the Term Sheet, including sitting on the Board of Directors of Sagebrush.  A party may not accept the beneficial aspects of the parties' agreement, while at the same time seek to "undo" those provisions that are not acceptable.

The Court further rejects Elinsky's argument that Trebilcock materially breached the parties' agreement in such a manner that rescission is an available remedy.  As an initial matter, the failure of consideration is generally not a sufficient basis to permit rescission unless "such failure is 'expressly made a ground of forfeiture.'" *Elyria Anesthesia Servs., Inc. v. Valgento*, 1993 WL 135820 at *1 (Oh. Ct. App. April 29, 1993)(*quoting City of Cleveland v. Herron*, 102 Ohio St. 218 at syl. par. 2 (1921)).  There is no language in the Term Sheet suggesting that Trebilcock's failure to make timely payments would constitute a forfeiture.  Elinsky points out that, in certain instances, the failure to make timely installment payments is a sufficient basis to warrant rescission. This failure, however, must be "so substantial and fundamental as to go to the very root of the contract." *United States v. Southern Const. Co.*, 293 F.2d 493, 498 (6th Cir. 1961), *rev'd on other grounds sub nom.*, *Southern Const. Co. v. Pickard*, 371 U.S. 57 (1962).[3]

---

[3]  The Court notes that most, if not all, of the caselaw addressing whether failure to make timely payments warrants rescission involve situations in which the injured party has not yet fully

The following factors are relevant to determine whether a breach is sufficiently material to warrant rescission,

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*England v. O'Flynn*, 2002 WL 27314 at *6 (Oh. Ct. App. Jan. 11, 2002)(*citing Kersch v. Montgomery Developmental Center*, 519 N.E.2d 655 (Oh. Ct. App. 1987).

Upon review of these factors, the Court concludes that Trebilcock's failure to remit timely payments to Elinsky does not amount to a material breach sufficient to warrant rescission of the Term Sheet. Based on the facts of this case, all of the factors weigh in favor of Trebilcock. Elinsky's performance was complete as of the signing of the Term Sheet. As a result, the only loss suffered by Elinsky as a result of Trebilcock's failure to make timely

---

> performed. For example, in construction contract cases, the contractor seeks rescission on the grounds that his performance obligation should be discharged based on the hiring party's failure to make timely payments. This situation is vastly different from the present. Elinsky's performance was complete as of the signing of the Term Sheet. Under the contract, he expressly agreed to exchange his interest in Sagebrush as of the date of execution. In exchange, Trebilcock agreed to make specific payments. Upon Trebilcock's default, there was no performance owed by Elinsky.

payments consists of the loss of the time value of his money.  Moreover, as Trebilcock points out, the Term Sheet contains an interest rate, which demonstrates that the parties contemplated that Elinsky would not have immediate access to the total sales price. While this interest rate was not expressly tied to *delayed* payments, it supports a finding that Elinksy may be adequately compensated for the late payments made by Trebilcock.  Thus, the Court finds that the first two factors weigh heavily against the equitable remedy of rescission.  The Court further finds that the third factor weighs against rescission.  At least some of the consideration tendered by Trebilcock, including Elinsky's seat on MCPc's Board of Directors cannot be tendered back.  Thus, Trebilcock would suffer some degree of forfeiture.  With regard to the fourth factor, the Court notes that Trebilcock made at least one attempt to pay the debt in full.  The Court also finds that Elinsky fails to establish that Trebilcock's failure to make timely payments was done in bad faith.  In all, reasonable minds could only conclude that Trebilcock's failure to remit payments under the Term Sheet was not a material breach sufficient to warrant the equitable remedy of rescission.  Rather, Elinsky's remedy is limited to breach of contract.

Elinsky also claims that he is entitled to rescission because he was fraudulently induced to enter the Term Sheet.  As set forth above, fraudulent inducement is a basis for rescission.  To prove fraudulent inducement, Elinksy must demonstrate by clear and convincing evidence that Trebilcock knowingly made a false misrepresentation of material fact and that Elinsky relied on the misrepresentation to his detriment.  *Owens*, 1996 WL 56086 at * 2.

In support of his argument, Elinsky argues that Trebilcock misrepresented that he and the Elinskys would equally manage Sagebrush.  The Court finds that, as a matter of law, this alleged misrepresentation cannot form the basis of a fraudulent inducement claim vis à vis the Term

12

Sheet for the simple reason that Elinsky admits he knew of Trebilcock's claim that he was the managing member of Sagebrush. In Paragraph 16 of Elinsky's affidavit he avers that "...the Term Sheet was not intended to resolve a critical dispute between Trebilcock and myself with regard to his claim that he was the managing member of Sagebrush...." In light of Elinsky's own testimony, he cannot establish a critical element of a fraudulent inducement claim, i.e., justifiable reliance.

In his statement of facts, Elinsky claims that Trebilcock induced him to sign the Term Sheet based on a promise that MCPc would retain Austin Capital and would expand its operations to the Mid-Atlantic. The Court finds that these alleged fraudulent representations cannot form the basis of a fraudulent inducement argument because, as Elinsky himself admits, these are promises that only MCPc could deliver. Elinsky admits that they were expressly excluded from the Term Sheet because the decisions required approval of the Board of Directors of MCPc. Thus, Elinsky cannot now claim that he relied on a promise that he knew Trebilcock could not perform. As a result of Elinsky's failure to introduce sufficient evidence to create a question of fact with regard to fraudulent inducement, rescission is not available.[4]

---

[4] Elinsky's argument also fails because he did not timely elect rescission. Elinsky avers in his affidavit that he told Trebilcock in July of 2003 that Trebilcock's failure to make timely payments was unacceptable and that Elinsky would not agree to sell his interest. Elinsky offers this evidence in support of his position that he timely elected rescission. This affidavit, however, is entirely inconsistent with the events transpiring after July of 2003, including Elinsky's own actions. For example, Elinksy continued to sit on MCPc's Board of Directors. In addition, Elinsky made no effort to return the $350,000 Trebilcock had already paid. Moreover, Elinsky, in his capacity as director of MCPc, agreed to an extension of credit from PNC for the purpose of effecting Trebilcock's buyout of Elinsky's interest. The Court finds that

13

In addition to arguing rescission, Elinsky appears to argue that the Term Sheet is not enforceable because it is not fully integrated and there was no meeting of the minds. Specifically, Elinsky claims that the Term Sheet did not resolve the parties' dispute regarding the management of Sagebrush. In response, Trebilcock argues that the Term Sheet is clear and unambiguous and therefore, the Court cannot consider parol evidence regarding the management issue. Trebilcock further points out that O.R.C. § 1705.24 expressly dictates the management rights of the members of an LLC absent an express agreement to the contrary.

"An enforceable contract may be created where there is an offer by one side, acceptance on the part of the other, and a meeting of the minds as to the essential terms of the agreement." *McCarthy, Lebit, Crystal & Haiman Co. v. First Union Management, Inc.*, 622 N.E.2d 1093, 1097-98 (Ohio Ct. App. 8th Dist. 1993). In order to form a valid contract, the parties "must have a distinct and common intention which is communicated by each party to the other." *Id.* at 1098.

The Ohio Supreme Court has defined the elements of a contract as follows:

> 'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'

*Kostelnick v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (quoting *Perlmuter Printing Co. v. Strome, Inc.,* 436 F.Supp. 409, 414 (N.D. Ohio 1976)). To prove the existence of a contract, a plaintiff must show that there was a "meeting of the minds" and that the contract was definite as to its essential terms. *Id. See also Nilavar v. Osborn*, 711 N.E.2d 726, 732 (Ohio Ct. App. 2nd Dist. 1998).

---

Elinsky's belated attempt to claim that rescission occurred in July of 2003 is not credible in light of Elinsky's own actions.

In ascertaining whether there is a meeting of the minds, courts must focus on the objective manifestations by the parties. Courts presume that the element "meeting of the minds" is satisfied where the party enforcing the contract can point to a written and signed agreement that is clear and unambiguous. "Ordinarily, one of full age in possession of his faculties and able to read and write, who signs an instrument and remains acquiescent to its operative effect" is bound by the terms set forth therein. *See Cuyahoga Cty. Hospitals v. Price*, 581 N.E.2d 1125, 1128 (Ohio Ct. App. 8th Dist. 1989) (*quoting Kroeger v. Brody*, 200 N.E. 836, 839 (Ohio 1936)).

Ohio courts have further noted that, while the interpretation of the terms of a contract is undertaken as a matter of law, the existence of a contract is a question for the trier of fact. *Gruenspan v. Seitz*, 705 N.E.2d 1255, 1264 (Ohio Ct. App. 8th Dist. 1997). *See also Oglebay Norton Co. v. Armco, Inc.*, 556 N.E.2d 515, 519 (Ohio 1990) (holding that "[w]hether the parties intended to be bound . . . is a question of fact properly resolved by the trier of fact"); *PHD, Inc. v. Coast Business Credit*, 147 F.Supp.2d 809, 820 (N.D.Ohio 1997) (applying Ohio law, holding that "[w]hether or not a contract exists is a question of fact"). Only in the clearest cases should a court decide as a matter of law whether the parties intended a contract. *Arnold Palmer Golf Co. v. Fiqua Industries, Inc.*, 541 F.2d 584, 588 (6th Cir. 1976) (applying Ohio law).

Upon review, the Court finds that the Term Sheet is an enforceable contract and that there was a meeting of the minds as to its essential terms. As an initial matter, the parol evidence rule bars not only terms inconsistent with the express terms of a written agreement, but also those terms that add to the parties' obligations. See, e.g., *Tri-State Group, Inc. v. Ohio Edison Co.*, 782 N.E.2d 1240, 1246 (Ohio Ct. App. 7th Dist. 2002). Accordingly, the Court may not consider discussions regarding the management rights in order to ascertain whether a

15

meeting of the minds exists because those terms do not appear in the Term Sheet.  The Term Sheet is clear and unambiguous and was signed by both parties.  Although Elinsky notes that the agreement does not address management issues, an express statute dictates the management rights in the absence of an agreement to the contrary.  Nothing prohibited Elinsky from negotiating the management rights and including those terms in the Term Sheet.  For these reasons, the Court finds that the Term Sheet is an enforceable contract, even though it does not address the parties' management rights.

Based on the foregoing, the Term Sheet is an enforceable agreement and the ownership percentages set forth in that document control.  Trebilcock is entitled to a declaration that he owns 73.797% of Sagebrush while Gregory Elinsky owns the remaining 26.203%.

### B.  Satisfaction of payments

Trebilcock also seeks a declaration that he has satisfied all payment obligations pursuant to the Term Sheet.  Michael Elinsky does not dispute that Trebilcock paid him the entire amount due.  Accordingly, the Court finds that Trebilcock is entitled to the declaration he seeks with respect to Michael Elinsky.

The Court finds, however, that Trebilcock is not entitled to a declaration that he satisfied all payment obligations with regard to Gregory Elinsky.  It appears undisputed that Trebilcock paid only $350,000 of the total debt.  Trebilcock claims that he sent a check for the unpaid amount to Elinsky and that he further sought wiring instructions after Elinsky claimed he did not receive the check.  It appears that Trebilcock is arguing that these efforts "satisfied" his payment obligations.  Absent additional argument from the parties on this issue, the Court cannot say that Trebilcock satisfied all payments to Gregory Elinsky.

      2.      Exclusion of evidence of "pre-Term Sheet" fraud/counterclaim two

Trebilcock moves for an order precluding consideration of what he describes as "pre-Term Sheet" fraud.  According to Trebilcock, any such evidence is barred by the parol evidence rule and may not be used for any purpose in this case.

In response, Elinsky argues that the parol evidence rule is not actually a rule of evidence. Rather, it is a substantive rule that defines the limits of a contract.  According to Elinsky, any pre-Term Sheet fraud is admissible with respect to the fraud and breach of fiduciary duty claims. Elinsky also argues that the Term Sheet was not the final integration of the parties' agreement because it fails to address management issues.  With regard to the Term Sheet, Elinsky argues that the parol evidence rule does not preclude consideration of evidence of fraudulent inducement.

As set forth above, this Court concludes that the Term Sheet is clear and unambiguous. In addition, the Court considered and rejected Elinsky's claim regarding fraudulent inducement with respect to that agreement.  Accordingly, the Court must now consider whether Trebilcock is entitled to a ruling that all evidence of "pre-Term Sheet fraud" must be excluded for all other purposes in this case.  The Court finds that Trebilcock's request must be denied.  Trebilcock fails to identify which pieces of evidence, if any, are purportedly being used to alter the clear and unambiguous terms of the Term Sheet under the guise of a fraud or breach of fiduciary duty claim.  Trebilcock decided to address these issues in broad-sweeping fashion and the Court will not parse through each piece of evidence to *sua sponte* determine which items would be prohibited in light of this Court's construction of the Term Sheet.  Suffice it to say, based on the arguments presented, Trebilcock is not entitled to the ruling he seeks.  The Court is careful to

note that this opinion should not be construed to mean that evidence of "pre-Term Sheet" fraud will be considered.  Rather, in the event Elinsky attempts to rely on any such evidence in opposition to summary judgment on the remaining claims, the Court will be better positioned to analyze the admissibility of any such evidence in the event Trebilcock argues for its exclusion.  For these same reasons, he is not entitled to summary judgment on counterclaim two.

        3.     Defamation

In count two, Trebilcock asserts a claim for defamation.  According to Trebilcock, Elinsky published a defamatory letter accusing Trebilcock of engaging in fraud.  Elinsky points out in his brief in opposition that, although Trebilcock purports to attach a copy of the letter as an exhibit to his motion, no such letter is attached.  Although Trebilcock filed a reply brief addressing the defamation claim, he again failed to attach the letter.  As such, summary judgment is not warranted for the simple reason that the Court is not in possession of the allegedly defamatory material.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is GRANTED in PART and DENIED in PART as set forth herein.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/26/07